United States District Court
Southern District of Texas
**ENTERED**
March 14, 2017
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

### VICTORIA DIVISION

| | | |
|---|---|---|
| DAVID MEJIA, #863486 | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. V-13-047 |
| | § | |
| LORI DAVIS, DIRECTOR | § | |

## REPORT AND RECOMMENDATION

Before the Court, by referral from the Honorable Nancy F. Atlas, United States District Judge, is the Amended Motion for Summary Judgment of Respondent, Lori Davis, the Director of the Texas Department of Criminal Justice - Institutions Division; the Motion seeks the dismissal, for various reasons, of all claims asserted by Petitioner, David Mejia, in his Petition for a Writ of Habeas Corpus and its subsequently filed Amendment. Mejia, through court-appointed counsel responded to the Motion, but has also filed for a continuance and permission to conduct discovery on a new issue. Despite Mejia's request, it is the opinion of this Court that the Respondent's Amended Motion is sufficiently ripe for disposition.

It seems the evolution of the Antiterrorism and Effective Death Penalty Act of 1996 has made it all but impossible to attain federal habeas relief. Nevertheless, after objectively reviewing the entire record for a second time this Court remains clearly convinced the record establishes that in certain respects trial counsel's representation of Mejia was so ineffective that no fair minded jurist could agree that the state court's

decision to deny habeas relief was reasonably correct and that Mejia's conviction is reliable and should stand unquestioned by this federal forum. This Report and Recommendation is issued in support of that conclusion.

## JURISDICTION

On February 25, 1999, Mejia was convicted of murder by a jury in the 3077th District Court of Victoria County, Texas, which is located within the confines of the Southern District of Texas. The jury assessed punishment of life imprisonment and a $10,000.00 fine. The conviction and sentence were affirmed by the 13th Court of Appeals on June 1, 2000. On June 20, 2011, Mejia was granted the right to file an out of time Petition for Discretionary Review because his appellate attorney, Alex Luna, who had also represented him at trial, failed to convince the Court of Criminal Appeals that he had given Mejia the required notice of his right to file a pro se Petition for Discretionary Review after Luna had elected not to do so in his behalf. Mejia's out of time Petition was refused by the Court of Criminal Appeals on November 2, 2011. Mejia's second state habeas petition was denied on March 20, 2013. Mejia timely filed his federal petition on July 10, 2013. The District Court, therefore, has jurisdiction under 28 U.S.C. § 2254; Wadsworth v. Johnson, 235 F.3d 959, 961 (5th Cir. 2000).

## THE TRIAL EVIDENCE

The incident leading to the indictment of Mejia occurred at Alicia's Place, a bar in Victoria, Texas. In the early morning hours of April 17, 1998, several young men

confronted each other in the parking lot, a fight broke out and during the brief encounter Mejia fatally stabbed Marcos Torres.  However, to best evaluate Luna's performance a detailed review of the trial evidence is necessary.

Shortly before midnight on April 16, 1998, Johnny Arce went to Alicia's with his girlfriend, Macaria Flores, Mejia's sister, and  Marcus Mejia, Mejia's younger brother. As they were leaving about 30 minutes later they saw three young men, including Marcos Torres, entering Alicia's.  One of the men said "there goes one of those Arce boys" and Arce recognized them as "the ones that had jumped us" about two years before.  Because Arce was tired of "running from them" since then, he decided he would see if they could agree to a truce or had to fight it out in order to "just get it over with."  Arce, however, decided that he wanted protection in case he had to fight so he, Macaria, and Marcus picked up Martin Martinez and Mejia, at the home of John Lopez, Mejia's uncle, before returning to Alicia's.  Mejia, who was using a kitchen paring knife to eat a piece of fruit put the knife in his back pocket as they rode back to Alicia's.  On the way Arce told Mejia and Martinez about the fight two years earlier before and asked them to make sure nobody jumped into his fight if one occurred.

When the five of the them arrived at Alicia's Arce when inside and told the young men, who were drinking beer and shooting pool with Dennis Torres, Marcos Torres's father, he wanted to see them in the parking lot.  In the parking lot a crowd began to gather and then a fight broke out.  Although Arce intended to fight Marcos Torres,

Demetrious Torres, his older brother, attacked Arce instead.  As they fought together Mejia saw Marcos Torres approaching his little brother so he got between them and pushed his brother back.  Torres then began to swing at Mejia, but Mejia pushed him away.  According to Mejia, Torres then lifted his shirt and Mejia saw a pistol tucked in his waistband.  Torres said " Your ass is mine" and started to pull the weapon.  Mejia then pulled the knife from his back pocket stabbed at Torres one time and then ran to their car.  At the same time, at least one female voice screamed "He has a gun" or just "gun" and everyone began to scatter.  Arce and Macaria and Mejia jumped into their car and drove away.  They picked up Martinez and Marcus, who had fled down the street.  They then drove to the apartment of Lorenzo Dominguez.  On the way Arce heard Mejia say "he had something for me" he lifted his shirt "and he came towards me and I stabbed him."

Meanwhile, Marcos Torres had collapsed after a few minutes in the parking lot. Mejia's stab had penetrated the right ventricle of his heart.  Torres was taken to Citizen's Hospital by EMS where he was later pronounced dead.

When Mejia and the others arrived at the Dominguez's apartment they were let in by his roommate John Gomez.  They told Gomez about the fight.  Mejia said he had stabbed someone and demonstrated how he had done it, but according to Gomez he did not mention a gun.  Mejia then put the knife in the kitchen sink.  Gomez later washed it and wrapped it in a cloth.

4

Dominguez was asleep upstairs when they arrived, but their voices woke him up. He heard Mejia talking about a fight at Alicia's and heard him say that he had gotten the guy that had jumped Johnny and "I got the mother fucker. I stabbed him." Dominguez did not hear any mention of a gun.

Later that morning Marcaria and Arce were at the home of John Lopez. Lopez heard them talking about the fight and the fact someone had died. He heard Macaria say that the knife, which Mejia had taken from Lopez's house, was at Dominguez's apartment. That afternoon when Lopez picked up Dominguez to drive to work he saw the knife at the apartment and told Dominguez the knife was his and to tell Gomez to get rid of it. Gomez later threw the knife in a dumpster. The knife was later retrieved during the police investigation.

Macaria testified that she witnessed the fight between Arce and Demetrious. She also pushed Torres's father away when he grabbed Arce during the fight. And then she heard someone yell "gun" and she ran toward their car. Before she got into the car she saw Torres bleeding; he was holding his shirt up and she did not see a gun.

According to Martinez, who had gone inside Alicia's to use the bathroom, he first saw the fighting when he came back out to the parking lot. He saw the confrontation between Mejia and Torres. He saw Torres lifting his shirt and going toward Mejia, but he could not see if he had a gun or not.

During cross examination, Mejia, during the presentation of his case, was asked if his little brother Marcos, who was standing right behind him, had seen that Torres had a gun. Mejia's response was "I don't know." Marcus was the only one of the four people with Mejia that night who was not called to testify at trial.

Three disinterested patrons at Alicia's saw parts of the incident. Johnny Garcia testified he saw Torres run into the bar, out again, and then fall; he saw no gun or knife. Rosa Almaguer first saw some "guys running" and Torres on the ground bleeding, but saw no gun or knife. Connie Castro saw the fight start and went back inside to call for help, but by the time she came back she found Garcia next to Torres who was lying on the ground; she did not see any knife or gun either.

Officers Trevino and Cross of the Victoria Police Department came to the scene. They testified that no one mentioned a gun so they had no reason to search for one, but by the time they arrived Trevino said it could have been removed.

Detective Melenkevitz testified that none of the ten to twenty people that were interviewed, including Arce and Flores, said Torres had a gun. He testified that both Arce and Flores said they "heard a girl running around the parking lot during the fight saying 'He's got a gun. He's got a gun,'" but could not identify who it was. He later testified that of "everybody we talked to that told us they heard this female or saw this female," nobody was able to identify her.

6

Dennis Torres testified that his son did not own a gun and did not have one in his possession that night.  Demetrious Torres also testified that his brother did not own a gun or have one with him that night.

At the close of the evidence of the guilt phase of the trial the judge held a conference to discuss the proposed jury charge.  The Court noted that the proposed charge did not  contain any instructions regarding any lesser included offenses "based upon the testimony" and specifically asked Luna if that was the charge he wanted to submit.  Luna replied "That is correct."

Following closing arguments the jury deliberated and returned a verdict finding Mejia guilty of murder.

At the punishment phase of trial the state offered evidence that Mejia was placed on juvenile probation for theft in November 1990.  He subsequently committed an aggravated assault by being found to have shot Joe Esparza in the lower back and was given nine months of juvenile detention.  After being released he committed technical violations, two marijuana possessions and resisting arrest for which he was confined at a Texas Youth Counsel Facility.  Based upon that evidence the supervisor of the Victoria Probation Department testified that Mejia was not a good candidate for a probated sentence.

During his cross examination of Esparza, Luna "suggested" numerous times that Esparza did not actually see that it was Mejia who shot him and not someone else present

7

at the time, but he produced no documents or evidence to impeach Esparza's testimony. Mejia testified that someone else had shot Esparza, but Mejia chose not to reveal that person's identity to the police.   He also testified he had never hit the officer who had testified to the contrary about the resisting arrest incident.   He then reiterated his position on self defense.

After closing arguments the jury assessed Mejia's punishment at life imprisonment and imposed a $10,000.00 fine.

## ANALYSIS

### I.

Mejia's most significant ground for relief is his claim that Luna's trial representation was constitutionally ineffective because of his failure to present the testimony of Mejia's younger brother, Marcus, as a defense witness.   Mejia asserted this ground in his state application and supported it with an affidavit from Marcus.   The affidavit includes the following averments:

> I clearly recall speaking to my brother's attorney Mr. "Alex Luna" as well as making a request to him to appear in court to give truthful testimony regarding the incident between my brother David and "Marcos Torres" . . . But Mr. Luna never would call me in to testify.

> . . .

> My brother was trying to avoid the confrontation between me and Torres by telling Torres to leave me alone twice.   However, the second time, my brother told Torres to leave me alone, Torres started attacking my brother by swinging punches at him.

> My brother first responded by trying to block the punches and move away from him.  But Torres continued.  So my brother began punching back. That's when I seen Torres reaching under his shirt for something.  Then I seen a silver gun in the waistband of his pants.
>
> Torres then began taking fast steps toward my brother with the gun . . . . my brother, simply reacted with quick reflexes and struck Torres once with the knife in self defense.

Luna was ordered to respond to Mejia's state application.  He also submitted an affidavit.

As to this ground Luna averred, in toto:

> At the time of this trial, I had over 20 years experience in doing jury trials. Some years I had done as many as eight jury trials in a year.  I have always allowed the client to have a great amount of say so in the direction of the trial and whatever witness he wishes us to call.  Applicant never asked me to call his brother to testify on his behalf.  It was probably more of a situation where he did not want to call him as witness.  One possible explanation could have been that he did not want to implicate his brother in the offense.  After 13 years, I am not sure of the possible reason for this. As stated before, the client would always have control of the direction of the trial.  I would never refuse to call someone as a witness that would help the case unless  I was instructed not to do so.

The trial judge found Luna's affidavit "credible," but failed to articulate any specific factual findings he made or reasonable inferences he drew from Luna's recitals and the Texas Court of Criminal Appeals' summary denial shed no light on these matters.

A close scrutiny of the two affidavits, however, fails to support any argument that the state court's decision was a reasonable application of the clearly established law under Strickland v. Washington, 466 U.S. 668 (1984).  Marcus clearly states he spoke with Luna and expressed his desire to testify at trial, however, while Marcus mentions Torres

had a gun, it is not clear whether Marcus actually told Luna about the gun.  If he did, then

Luna failed to call the only known[1] witness able to support Mejia's claim of self defense.

Such failure can easily be found to constitute ineffective assistance.  Cf.  Chambers v.

Armontrout, 907 F.2d 825, 828-32 (8th Cir. 1990) (Counsel's failure to call the only eye

witness who could bolster the defendant's claim of self defense, held to be ineffective

assistance of counsel under Strickland.)      Significantly, there is nothing in Marcus's

affidavit from which it could be argued that his trial testimony would have been more

damaging than helpful to Mejia's defense and justify the decision not to call him as a

reasonable tactical trial decision.  But even if Marcus did not tell Luna about the gun,

Luna's representation fell short of the constitutional mark; Luna had a "duty" to fully

interview Marcus, Henderson v. Sargent, 926 F.2d 706, 711 (8th Cir.) (en banc) cert.

denied 498 U.S. 950 (1990), and he would have discovered that Marcus saw Torres in

possession of a gun and threatening to use it against Mejia when Mejia reacted by stabbing

at him with the knife.  "The failure to interview eye witnesses to a crime may strongly

support a claim for ineffective assistance of counsel."  Bryant v. Scott, 28 F.3d 1411,

1415 (5th Cir. 1991) (citing, Gray v. Lucas, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982).

Moreover, "the decision to interview a potential witness is not a decision related to trial

---

[1]  There is no question it was known that Marcus was at the scene of the incident.  In addition, his testimony would have added believability to the testimony of the various witnesses who said they heard an unidentified female screaming "He has a gun, he has a gun."

strategy.  Rather, it is the decision related to adequate preparation for trial." <u>Chambers</u>, 907 F.2d at 828.

A careful dissection of Luna's affidavit, even if "credible," presents no justification to excuse his deficient performance.  Luna does not even mention whether Marcus and he spoke at all which raises one of the same shortcomings expressed above:  if he did not ever speak with Marcus, his trial preparation investigation was ineffective.  <u>Bryant</u>, 28 F.3d at 1415; <u>Henderson</u>, 926 F.2d at 711.  Luna then blames Mejia for not asking him to call "his brother" to testify and offers two potential and speculative reasons why Mejia did not ask:  he may not have wanted his brother to testify or he may not have wanted to implicate his brother in the offense.  But Luna immediately admits he is "not sure of the possible reason for this."  None of this makes any tactical sense.  If Mejia, as he testified, did not know whether Marcus had seen the gun he would not have any particular reason to "ask" Luna to call him as a witness.  Under this scenario, Luna is simply abdicating his duty to provide effective assistance by either interviewing Marcus, if he had not done so, or making the decision to call him to help Mejia's case.  Certainly Luna did not need Mejia's permission to call such a crucial witness.  If, on the other hand, Mejia knew Marcus had seen the gun it seems inconceivable (1) that he would not want Marcus to corroborate his testimony that he acted in self defense and (2) that despite the passage of time Luna would not recall any discussions with Mejia concerning the risks of not calling Marcus.  Luna's guess that Mejia did not want to implicate Marcus is, likewise,

incredulous.  If anyone were a candidate for "implication" it would be Arce, who instigated the confrontation and was called as a witness by the state, not Marcus, who was just asked to stand by and to offer protection if someone other than Torres tried to join the fight, if any, between them.  Luna concludes by stating "I would never refuse to call someone as a witness that would help the case unless I was instructed not to do so," thereby injecting the speculative inference that Mejia must have ordered him to not call the only known witness who could support his defense to the murder charge.  Luna's affidavit simply does not provide any factual basis to justify his failure to call Marcus as a witness.  As a result, despite the trial court's pronouncement that Luna's affidavit is "credible," it supplies no answers of any kind for why Luna did not call Marcus and does not begin to suggest which of the speculative theories led him to make that decision. Consequently, there are no actual factual averments from which the court could make any specific or inferential findings of fact to support the conclusion that Luna's assistance, in regard to this claim, was constitutionally adequate.  Stated another way, there are no justifiable factual findings which can be presumed to be correct.

The question that remains is whether the failure to call Marcus resulted in any prejudice.  Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors," the "result would have been different."  Strickland, 466 at 694-95.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome," Id. at 694, of either the guilt and innocence phase or the punishment phase of

the trial.  Chambers, 907 F.2d at 832 n.13.  Here, the probative value of Marcus's testimony is strikingly clear, no other known witness saw Torres with the gun; his was the only testimony that corroborated Mejia's self defense and, as such, it had great potential to aid Mejia's case.  Luna's failure to present that testimony was an error "so serious as to deprive (Mejia) of a fair trial, a trial whose result is reliable."  Strickland, 466 at 687.  The prejudice is plain.

If it is still true that "a single, serious error may support a claim of ineffective assistance of counsel," Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (citing, United States v. Cronic, 466 U.S. 648, 657 (1984)), Luna's failure to call Marcus as witness at Mejia's trial is just such a serious error.

## II.

Mejia is also critical of Luna's failure to request jury instructions on any lesser included offenses, for example, voluntary manslaughter.  The trial judge even suggested that the evidence supported such instructions and expressly asked Luna if the instructions which did not include any lesser offenses were what Luna what submitted, but Luna declined the invitation to submit any options to the murder charge.  In his defense of that decision Luna explains in his affidavit:

> The strategy of the whole trial was self-defense.  This was brought out in voir dire and in questioning of all of the witnesses.  The testimony of the whole trial centered around applicants's contention that the deceased had a gun.  My recollection was the applicant's position was that he was not guilty of anything because of his self defense strategy.  That was why he

13

> pleaded not guilty and agreed to testify on his behalf on this contention of self defense.  There was no evidence of any provocation on behalf of the deceased.  Appellant had gone to the confrontation with the knowledge of the purpose and had armed himself with the weapon, a knife.

Luna's evasive affidavit does not provide a sufficient basis to justify foregoing any lesser included offenses as a reasonable strategic decision.  At best, it infers that Mejia himself chose this "strategy," but Luna does not say he even explained what a lesser included offense instruction was to Mejia, much less discuss its advantages.  He certainly does not say the Mejia ordered him not to ask for such instructions.  Obviously, reliance upon self defense will not preclude the inclusion of such instructions, in fact, Mejia was entitled to them, Hunter v. State, 647 S.W. 2d 657, 658 (Tex. Crim. App. -- 1983) (en banc), and the trial court even had the authority to include them in the absence of a request, McQueen v. State, 984 S.W. 2d 712, 717 (Tex. App. -- Texarkana, 1998), and even over a defendant's objections to do so.  Humphries v. State, 615 S.W. 2d 737, 738 (Tex. Crim. App. -- 1981) (Where record reflected that defendant stabbed a victim in course of a heated argument, no error was committed by submission of a voluntary manslaughter charge as a lesser included offense of murder charged in the indictment, even over the defendant's objections.).  Moreover, if Luna unilaterally opted to decline the judge's invitation to the detriment of his client, as is certainly a reasonable inference to draw from his averments, he would not have been providing effective assistance against the murder

charge. Surely, Mejia was entitled to make an informed decision about making such a risky "all or nothing" call.

Luna then makes the incredible statement that "(t)here was no evidence of provocation on behalf of the deceased." It is inconceivable that the trial judge could have found this statement credible in light of Mejia's testimony that during the fight Torres attacked him and threatened to shoot him. How can that inferred finding be entitled to a presumption of correctness? After all, Mejia's sworn testimony is "evidence" just as much as any other witness's testimony. In fact, in his four-sentence long opening statement Luna even told the jury that Torres "directed his aggressions towards this individual (Mejia) and this individual (Mejia), in trying to get away stabbed him and then he continued to run away." And if the trial court truly found it credible that there was no evidence of provocation, then there was no evidentiary basis for the judge to have submitted the issue of self defense to the jury and certainly no reasonable strategic decision on Luna's part to even present such a meritless defense.

Luna goes even further, he implies that Mejia when to Alicia's knowing a fight would occur so that he "armed" himself with a weapon capable of killing someone. Mejia's testimony was that he had the knife only because he was using it while eating a lemon[2] when he was asked to accompany Arce for protection in case a fight did break out.

---

[2] Mejia's sister, Macaria, testified at trial that she saw Mejia with a lemon when they picked him up.

It seems Luna not only failed to provide effective assistance of trial, he now wants to shift the blame to Mejia, as if he should have provided effective assistance of client.

When coupled with the failure to Marcus to confirm the existence of the gun, the failure to request any lesser included offense instructions prejudiced Mejia's case by completely forfeiting the only potential for a more lenient conviction.

### III.

Mejia also claims that (1) the state failed to disclose immunity agreements it had entered into with several witnesses that testified against him and (2) Luna failed to cross-examine several of the state's witnesses[3], including his sister Macaria, about the prosecutor's threats to charge them as accessories to murder unless they testified against him.  Luna's affidavit responds to the first claim as follows:

> None of the witnesses applicant mentions in this ground ever testified that they had been given any type of immunity agreement in regards to their testimony.  None of these witnesses had been charged with any offense related to the murder offense.  A significant amount of time had already past (sic) from offense date to trial date if any charges would have been filed against any of these witnesses.  Most of these witnesses testified saying things in favor of applicant.

This response offers no relevant factual averments that, even if credible, speak to the propriety of the state court's disposition of this claim.  Limiting the response to actual "immunity" agreements unfairly limits Mejia's pro se allegations.  An actual agreement

---

[3]   Mejia alleges that John Gomez, Johnny Arce, Martin Martinez and Lorenzo Dominguez are a part of this group.

is unnecessary; evidence of any understanding as to a future prosecution would be relevant to the credibility of a witness and the jury would be entitled to know of it. Giglio v. United States, 405 U.S. 150, 154-55 (1972). The Court assumes Luna should have known it too and, at least, asked the state for such information. And, of course, none of the witnesses would have voluntarily testified they had been given immunity or been promised they would not be prosecuted, that is fodder for impeachment. Luna had an obligation to discover whether any such agreements existed whether the state disclosed them or not. Relying on a witness's trial testimony to disclose such evidence is yet another abdication of Luna's obligations. The fact that none of the witnesses, despite the passage of considerable time, had been charged does nothing to negate the existence of any pre-trial promise not to prosecute any witnesses in return for testimony favorable for the prosecution. Finally, Luna's pronouncement that "most" of these witnesses gave testimony favorable to Mejia is belied by the record discussed above.

> Luna's affidavit responds to the second, related claim in a similar manner:
>
> None of these witnesses had been charged with any offense related to the offense applicant was being charged with. A significant amount of time has past (sic) from offense date to trial date. None of the witnesses applicant refers to testified as to any immunity agreement or that they had been threatened with any charges. There was no notice of any type from anyone including the state that such agreement existed as to any witnesses.

Again, the fact that none of the witnesses had been subsequently charged does not command a finding that there had been no agreement not to do so, on the contrary, it

would be consistent with the existence of such an agreement.   Consequently, it does nothing to advance Luna's inference that he provided effective assistance.   And the fact that he was given "no notice of any type from anyone including the state that such agreement existed as to any witness" does not convert his shortcoming of not even asking, into effective assistance.

However, dwelling on Luna's poor performance, while it may shed some light on Mejia's other grounds, will not rescue these two claims from dismissal.   As Respondent points out, even if the agreements existed and were suppressed "Mejia wholly fails to establish materiality."   Evidence is material only if it can be shown that there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different.   United States v. Bagley, 473 U.S. 667, 682 (1985).   The only evidence Mejia offers in support of these claims is the affidavit of his sister, Macaria.   Although she avers that she testified "against my brother in a way that would satisfy Mr. Hardy," she makes no mention of any false testimony she gave that was favorable to the prosecution.   In fact, Macaria was the only witness who testified that Mejia said he had seen the gun in Torres' possession.   Mejia has not offered affidavits from any of the other witnesses to support his conclusory inference that they gave false, inculpatory testimony in response to an immunity deal of any kind.

Of course, at the time Mejia filed his federal petition he was acting pro se.   In light of his allegations this Court appointed counsel to represent him.   Thereafter, this Court

recommended that Mejia, through counsel, be allowed to conduct discovery in an effort to "flesh out," if possible, these and his other claims.  Respondent, however, convinced the District Court that discovery was inappropriate and that recommendation was rejected. As a result, there is insufficient evidence in the record, if any, in support of these claims that could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 434-45 (1995). These claims, therefore, should be dismissed.

IV.

Mejia also claims that Luna's unprepared representation at the punishment phase of his trial was ineffective assistance.  According to Mejia, if Luna had investigated his juvenile conviction for aggravated assault against Joe Esparza he would have been able to disprove Esparza's testimony that he saw Mejia shoot him in the presence of Esparza's young daughter.  That impeachment would, in turn, have undermined the use of that conviction to support the probation officer's testimony that Mejia was a poor candidate for probation.

Luna's terse response was:

> Applicant had an opportunity to testify in the punishment phase of the trial and he could have explained any testimony presented in punishment that he did not agree with.  He did not do this.

It is hard to believe that the trial judge could have reviewed the "Reporter's Record of the Trial" and found Luna's statements that Mejia "could have explained any testimony

presented in punishment that he did not agree with" and "He did not do this," to be credible. It is clear from the "Reporter's Record" that Mejia actually did do what Luna says he did not. But, as this Court previously observed, Mejia's attempt to explain his disagreements without any supportive documentation to verify his challenges cannot be deemed an adequate substitute for Luna, as his lawyer, researching his criminal record, examining the transcripts and preparing an informed and effective professional cross-examination of the state's punishment witnesses if supported by that research. In Rompeilla v. Beard, 545 U.S. 374, 385-86 (2005), the Court found counsel's failure to examine the court records of the defendant's prior conviction that the state was probably going to rely on during the sentencing phase to be ineffective assistance. Reasonable efforts, the Court observed, would include obtaining the file, learning what the state knew of the crime, discovering any mitigating evidence and anticipating the details of any aggravating evidence.

Luna's failure to assist Mejia in rebutting the state's witnesses may have been ineffectiveness and may have adversely affected the outcome of the punishment phase. That is why this Court recommended Mejia's habeas counsel be allowed to conduct discovery; however, since that has been disallowed, the existing record renders this claim to be without merit. This claim, therefore, should also be dismissed.

V.

Respondent's Motion also seeks the dismissal of Mejia's amendment to his original petition which raises, for the first time, the argument that Luna's representation was unconstitutionally ineffective because he was operating under an undisclosed, actual conflict of interest that adversely affected his representation of Mejia.   The crux of Mejia's argument is that at the time of Mejia's murder trial Luna, who contemporaneously represented Marcus on an unrelated juvenile matter, chose not to call Marcus and adversely affect his juvenile case by implicating him in the murder, rather than to call him as a witness in support of Mejia's claim of self defense to murder.

The proper disposition of this matter turns on whether Mejia's allegations merely clarify or amplify his original claim and therefore relate back to that claim, United States v. Thomas, 221 F.3d 430 (3rd Cir. 2000), or whether they present a new ground of relief which is time-barred.   United States v. Gonzales, 592 F.3d 675 (5th Cir. 2009).   The mere fact that the allegations also present a Sixth Amendment ineffectiveness argument does not mean that they automatically relate back to the original claim, Id. 679.   Only if "the original and amended petition state claims that are tied to a common core of operative facts" will relation back be in order.   Mayle v. Felix, 545 U.S. 644, 664 (2005).   As critical as this Court is of Luna's performance, Mejia's argument that his conflict of interest allegations simply amplify his original claim is enticing, but after careful consideration, it appears the allegations raise a new and independent claim which is time-barred.

The Supreme Court has held that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980) (citing, Holloway v. Arkansas, 435 U.S. 475, 487-91 (1978). Mejia argues that Luna must have decided not to call Marcus as a witness in order to better serve Marcus's interests. Thus, the basis of this claim is the existence of the potential conflict, not the "effectiveness" of the decision not to call Marcus at Mejia's trial and what effect, if any, his testimony would have had on the outcome of that trial. The Court agrees with Respondent that this is a newly raised claim which does not relate back and is, therefore, untimely[4] and must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court **RECOMMENDS** that the Amended Motion for Summary Judgment (Instrument no. 47) of Respondent, Lori Davis, be **DENIED** as to Mejia's claims that Luna's failure to call Marcus Mejia as a witness and his failure to request any jury instruction on any lesser included offenses constituted ineffective assistance of counsel under Strickland v. Washington.

It is further **RECOMMENDED** that Respondent's Amended Motion for Summary Judgment (Instrument no. 47) be **GRANTED** as to Mejia's other claims.

---

[4]   Mejia's deadline for filing for federal habeas relief was August 31, 2013.

22

In the opinion of this Court, however, rather than risk granting habeas relief prematurely, the District Court should consider exercising its discretion to conduct an Evidentiary Hearing because "such a hearing could enable (Mejia) to prove the petition's factual allegations, which, if true, would entitle (Mejia) to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (cited with approval in <u>Cullen v. Pinholster</u>, 563 U.S. ___, _____, 179 L.Ed. 2d 557, 572 (2011).

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until **Friday, April 7, 2017**, to have written objections, filed pursuant to 28 U.S.C. §636(b)(1)(C), **physically on file** in the Office of the Clerk.  <u>The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553</u>.  Failure to file written objections within the prescribed time **SHALL** bar any Party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this _____14th_____ day of March, 2017.

John R. Froeschner
United States Magistrate Judge